Earl STONE, Petitioner,

v.

James STINSON, Superintendent,
Respondent.

No. 98–CV–356F.

United States District Court,
W.D. New York.

June 8, 2000.

Earl Stone, Comstock, NY, pro se.

Frank J. Clark, District Attorney, Erie County, J. Michael Marion, Nancy A. Gilligan, Assistant District Attorneys, of counsel, Buffalo, NY, for respondent.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

On September 23, 1998, the parties to this action requesting habeas corpus relief under3 28 U.S.C. § 2254 consented to proceed before the undersigned.

### *BACKGROUND*

Petitioner was charged with a total of nine criminal counts in two separate indictments returned by Erie County Grand Juries. Specifically, Indictment No. 94–1370–001, returned on June 3, 1994, charges Petitioner with Attempted Murder in the Second Degree (N.Y.Penal Law §§ 110.00 and 125.25[1]) (McKinney 1998) [1] (Count I), Assault in the First Degree (N.Y.Penal Law § 120.10[1]) (Count II), Reckless Endangerment in the First Degree (N.Y.Penal Law § 120.25) (Count III), Aiding and Abetting in Attempted Murder in the Second Degree (N.Y.Penal Law §§ 110.00, 125.25[1] and 20.00) (Count IV), and Aiding and Abetting in Assault in the First Degree (N.Y.Penal Law §§ 120.10[1] and 20.00) (Count V), in con-

---

1. Unless otherwise indicated, all references to New York Penal Law are to McKinney 1998.

nection with shootings that occurred on March 13, 1994 and March 24, 1994 in Buffalo, New York. Indictment No. 94–0719–T01, returned August 11, 1994, charges Petitioner with two counts of Murder in the Second Degree (N.Y.Penal Law § 125.25[1] and [2]) (Counts I and II), Assault in the First Degree (N.Y.Penal Law § 120.10[3]) (Count III), and Criminal Possession of a Weapon in the Third Degree (N.Y.Penal Law § 265.02[1]) (Count IV). Essentially, Petitioner was charged with regard to three separate shooting incidents that occurred over a thirty-two day period in 1994 in which four separate people were shot, including a seventeen year old who died as a result. On December 8, 1994, the two Indictments were consolidated for trial.

Following arraignment and disposition of pre-trial motions, jury selection for Petitioner's trial commenced on November 13, 1995 and concluded on November 17, 1995 when twelve jurors and two alternates were seated. Erie County Court Judge John V. Rogowski presided over pre-trial matters, jury selection and trial. The five day trial commenced on November 17, 1995, continued on November 22, 27 and 28, and concluded on November 29, 1995, when the jury found Petitioner guilty on eight counts. On January 11, 1996, Petitioner was sentenced as a second felony offender to concurrent and consecutive indeterminate sentences ranging from 10 years to life.

On May 30, 1997, the Appellate Division, New York Supreme Court, Fourth Department, affirmed Petitioner's conviction. *People v. Stone*, 239 A.D.2d 872, 659 N.Y.S.2d 674 (4th Dep't 1997). Leave to appeal to the New York Court of Appeals was denied on September 30, 1997. *People v. Stone*, 90 N.Y.2d 943, 664 N.Y.S.2d 762, 687 N.E.2d 659 (1997).

On June 3, 1998, Petitioner filed the instant petition seeking federal habeas relief pursuant to 28 U.S.C. § 2254 on three grounds alleging deprivation of his consti-

tutional rights to due process and equal protection at his trial including (1) he was not permitted to attend an *in camera* conference regarding whether a prospective juror should be excused; (2) prosecutorial misconduct; and (3) insufficient trial evidence to support the conviction. Respondent's answer to the petition (Docket Item No. 3) and a Memorandum of Law in support (Docket Item No. 4) ("Respondent's Memorandum") were filed on September 3, 1998. On November 18, 1998, Petitioner filed a Reply to the answer and in further support of his petition. (Docket Item No. 10) ("Petitioner's Reply").

Based on the following, the Petition is DISMISSED.

### FACTS

Petitioner, Earl Stone ("Stone"), was arrested and charged in connection with his participation in three separate shooting incidents in the City of Buffalo. The first incident occurred in the evening of March 13, 1994 when Stone and Jerry Knightner, who had argued earlier that day, re-encountered each other when Knightner followed Stone's truck to a house located at 87 Stevens Street, Buffalo. (T. 66–68).[2] After exiting their respective vehicles, Stone and Knightner resumed their argument. (T. 67–68, 175–76). Knightner testified he believed the argument was finished when Stone shook his hand and tapped Knightner on the back. (T. 68, 71, 176). Knightner then walked Stone to Stone's truck and spoke with someone inside. (T. 68, 176). Stone, however, did not enter the truck but, rather, went into the house at 87 Stevens Street. (T. 68, 71). Three to four minutes passed and Stone emerged from the house carrying a dark-colored plastic garbage bag. (T. 71, 72, 177). Knightner inquired whether Stone intended to shoot him and Stone advised Knightner to leave. (T. 72, 177). Knightner then returned to his car which was parked next to Stone's truck and en-

---

2. "T." references are to pages of the trial transcript.

tered it. (T. 72). Stone walked into the street. (T. 72). Before Knightner had shut his car door, gunshots fired by Stone shattered the rear window of Knightner's car and struck Knightner in his right arm. (T. 72–73). Realizing he had been shot, Knightner drove away to seek help, and Stone followed in his truck. (T. 73–74). Knightner pulled over in front of his grandparents' house but before getting out of his car, he noticed through the rear view mirror that Stone's truck was behind him. (T. 74–75). Knightner then drove toward the Precinct 12 police station on Genesee Street. (T. 75–77). En route, Knightner observed several more shots fired toward his car from a gun sticking out the driver's side window of Stone's truck. (T. 75–76). Upon reaching the police station, Knightner ran inside for help. (T. 79–80). Knightner was taken by ambulance from the police station to Erie County Medical Center ("ECMC") where his gun shot wound was cleaned and treated. (T. 80).

Deon Steward, an accomplice to the second shooting incident which occurred on March 24, 1994, testified at Stone's trial. Steward testified that he and Stone were riding around in the vicinity of Genesee Street and Goodyear Avenue in the early evening hours of March 24, 1994, and then proceeded to the intersection of Grider and Northland Streets where they encountered a Cadillac. (T. 248–49, 250–51, 253–54, 255–56). According to Steward, Stone instructed Steward to drive to 87 Stevens Street so that Stone could get a gun, which Steward interpreted as indicative that Stone held a grudge against the driver of the Cadillac, Marlon Clay. (T. 256). Upon arriving at that address, Stone entered the house and returned to Steward's vehicle a few minutes later carrying a rifle in a green garbage bag. (T. 256–58). The two then returned to Grider and Northland Streets but, as the Cadillac was no longer there, continued driving until Steward spotted Clay at a pay telephone at the corner of Genesee and Koons Streets. (T. 258, 260–62). As Steward crossed the intersection, Stone told him to "drive slow."

(T. 263). Stone, seated in the front passenger seat of Steward's vehicle, then pulled out the rifle, told Steward to roll down the driver's side window, placed the rifle across the steering wheel and fired more than five gunshots at Clay through the open driver's side window. (T. 263–64).

Clay sustained a gunshot wound in his left buttock and the bullet penetrated into his abdomen. (T. 311–16, 540). Clay was brought to ECMC where he underwent surgery. (T. 311–16, 540). A substantial amount of blood leaked into Clay's abdomen and his injuries were considered life-threatening. (T. 312–316). Clay's testimony at Stone's trial was largely consistent with Steward's testimony. (T. 531–59, 563–74).

After the shooting, Steward returned to 87 Stevens Street and Stone took the rifle back into the house. (T. 265–66). Stone and Steward then continued driving around until Steward was pulled over by the police for questioning with regard to Clay's shooting. (T. 266–68). Steward was charged with Stone under Indictment No. 94–0719–T01 as an aider and abettor to Attempted Murder in the Second Degree and Assault in the First Degree with regard to Clay's shooting. However, Steward eventually accepted a plea bargain wherein he testified on behalf of the prosecution at Stone's trial.

Jerry Knightner, the victim of the first shooting on March 13, 1994, also witnessed the third shooting which occurred on April 14, 1994, and testified as to it at Stone's trial. According to Knightner, in the afternoon of April 14, 1994, he observed Stone arguing with Nichole Branch on Goodyear Avenue and heard Stone threaten to kill Branch. (T. 84–86, 88). Knightner testified that he saw Tremaine Jacobs, otherwise known as "Teeter," driving a dark blue Ford Bronco, pull up to Stone and Branch and begin conversing with Branch. (T. 88). Teeter drove away toward Genesee Street and Stone then

walked across the street to his own truck. (T. 89–90). According to Knightner, Teeter returned to Goodyear Avenue a short while later with Clarence Jackson occupying the front passenger seat and Rayshawn Washington in the rear seat of Teeter's vehicle. (T. 94–95). Teeter drove up Goodyear back toward the area where Stone and Branch had been arguing, then turned his vehicle around and drove back down Goodyear toward McKibbon Street. (T. 96–99). As Teeter passed Stone's truck, Stone, who was standing next to the passenger side of his vehicle holding a gun resembling an AK–47 or an AR–15, opened fire on Teeter's vehicle. (T. 99–102). Knightner recalled that between ten and fifteen shots fired. (T. 101). Knightner's testimony regarding the third shooting incident was corroborated by Clarence Jackson who also testified at the trial. (T. 595–601).

The April 14, 1994 shooting was also witnessed by Kelvin Bryant, who testified that he was "at the corner of Three Aces Lounge" when he saw Stone drive down Goodyear Avenue and stop his truck in the middle of the street. (T. 392–93). Bryant saw Stone fire shots from his vehicle. (T. 393–94). Bryant then started back toward his house at 510 Goodyear Avenue and, upon reaching it, stood outside on the front porch. (T. 394–96). About two minutes later, Stone arrived at Bryant's house and parked his truck in the front yard. (T. 395–97). After exiting, Stone removed a weapon from the back of the vehicle and instructed Bryant to block him and follow him into the house. (T. 397). Once inside Bryant's house, Stone gave Bryant the weapon which appeared to be a loaded "black and brown stock AK" with a banana clip. (T. 398). Bryant put the weapon in his basement. (T. 398). Bryant's girlfriend, Teresa Dillon, testified that on April 14, 1994, Stone was present in Bryant's house with a "big gun" which Stone left behind. (T. 450).

Meanwhile, Teeter drove from the scene of the shooting to the ECMC to seek medical assistance for his passengers who had both been struck. (T. 598–601). Jackson testified that he was shot in the lower back. (T. 600–602). The bullet penetrated upward through Jackson's abdomen and into his chest, causing internal bleeding and injuries including grazing the tip of Jackson's heart before lodging in the wall of the pericardial sac surrounding Jackson's heart. (T. 317–18). Jackson described the shooter as a black male. (T. 603). Jackson testified that while Teeter drove them to ECMC, Jackson turned to look at Washington who was lying on the back seat of Teeter's vehicle, bleeding through his nose and mouth. (T. 604).

Washington died as a result of his gunshot wounds. (T. 625). Erie County Chief Medical Examiner Dr. Justin Uku testified that the results of an autopsy he performed on Washington indicated that the bullet entered Washington's body through his left armpit and lacerated two large blood vessels which supplied blood between the heart and left arm, and fragmented upon hitting the left shoulder bone. (T. 623–26). The wound resulted in significant internal bleeding, causing Washington's liver and kidneys to shut down and, ultimately, Washington's death. (T. 627–28).

In the spring of 1994, Stone moved from Buffalo to Virginia where he met and began a relationship with Shamika Walton who testified at Stone's trial. (T. 461–65). Walton testified that Stone admitted to her that he had shot several people in Buffalo, wounding one of his victims in the arm, paralyzing another and killing a third. (T. 463–64). According to Walton, she became frightened upon learning from a friend that law enforcement officers were looking for Stone in connection with the shootings and called the Newport, Virginia police and provided a lead as to Stone's whereabouts. (T. 465–66). In early July 1994, Stone was arrested in Virginia and returned to Buffalo where he was indicted for the March 13, March 24 and April 14,

1994 shootings. (T. 461–64). No weapons were ever recovered. (T. 359).

Stone was represented at trial by Mary T. Kosmerl, Esq. Assistant Erie County District Attorneys Lawrence M. Schwegler and Gary W. Hackbush prosecuted the case. Jury selection commenced on November 13, 1995 and concluded on November 17, 1995. On November 17, 1995, the court, in response to a request by Stephen Bennett, a prospective juror, met *in camera* outside the presence of counsel or Stone. (VT.473, 476).[3] Bennett informed the court that at 8:00 P.M. the previous evening, he had received a threatening telephone call from an acquaintance Bennett believed was incarcerated at the Erie County Holding Center. (VT.476). Bennett told Judge Rogowski that the caller advised Bennett to make sure he was selected for the jury and that Stone was acquitted. (VT.478). Bennett told the caller that he did not want to listen to threats and hung up the telephone. (VT. 478). Bennett was afraid to disclose the caller's identity to the judge. (VT.479–80). Bennett further indicated that he believed the caller placed the telephone at Stone's direction, and that Bennett may have had Stone as a student at the Educational Opportunity Center in Buffalo. (T. 479). Judge Rogowski arranged for Bennett to speak with someone from the Erie County District Attorney's office, in confidence, and outside the presence of both Stone and his attorney. (VT.478).

The trial commenced on November 17, 1995. Twenty-one prosecution witnesses, including the three surviving shooting victims and Stone's co-defendant with regard to the shooting of Marlon Clay, testified and one witness, Assistant District Attorney Gerald Schaffer who presented the first two shootings to the grand jury that returned the first indictment, testified on

**3.** "VT" references are to the page of the jury *voir dire* transcript.

**4.** With respect to Rayshawn Washington's death, Stone was indicted on alternative charges of second degree murder including

Stone's behalf. (T. 672–73). Schaffer testified on direct examination that although Jerry Knightner was a complainant in the case Schaffer presented to the grand jury in April 1994, Knightner was initially unwilling to identify Stone to the grand jury as the person who shot him on March 13, 1994. (T. 674–78). After Knightner was warned that he could be prosecuted for perjury, Knightner recanted his testimony and identified Stone as his shooter before the grand jury. (T. 679–83). On cross-examination, Schaffer testified that his threat to prosecute Knightner for perjury was based on Knightner's prior identification of Stone as his shooter in both a sworn deposition prepared shortly after the shooting and a later conversation with Schaffer. (T. 686). Knightner subsequently recanted his testimony and identified Stone as the shooter before the grand jury, explaining that death threats received by his family members had caused him to pretend he was unable to identify the shooter. (T. 687).

The jury found Stone guilty on eight of the nine counts.[4] (T. 885–89). Stone timely appealed his conviction to New York Supreme Court, Appellate Division, Fourth Department. On May 30, 1997, the Appellate Division affirmed the conviction. *People v. Stone*, 239 A.D.2d 872, 659 N.Y.S.2d 674 (4th Dep't 1997). Leave to appeal to the Court of Appeals was denied on September 30, 1997. *People v. Stone*, 90 N.Y.2d 943, 664 N.Y.S.2d 762, 687 N.E.2d 659 (1997). This action followed.

### DISCUSSION

Stone asserts three grounds for habeas relief including (1) that during jury selection, Judge Rogowski erroneously ruled on Stone's challenges for cause and also held an *in camera* conference with a prospec-

intentional murder (N.Y.Penal Law § 125.25[1]) and murder under circumstances evincing a depraved indifference to human life (N.Y.Penal Law § 125.25[2]). Stone was convicted of intentional murder.

tive juror without either Stone or his counsel present, (2) prosecutorial misconduct based on statements made during summation, and (3) insufficient evidence to support the intentional murder conviction. Petition at 7–8.

■ In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, a district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws or treaties of the United States. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). A state petitioner's federal habeas corpus petition may be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims, *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), a federal court is permitted to deny a state prisoner's habeas corpus petition on the merits of the claims for which the prisoner has exhausted available state remedies, even though the petition contains unexhausted claims. 28 U.S.C. § 2254(b)(2). However, failure to timely exhaust state remedies will result in procedural default of the claims. *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994); *Jordan v. Lefevre,* 206 F.3d 196, 198–99 (2d Cir.2000).

■ For a federal habeas claim to be exhausted, it must be presented to the state appellate court in the same factual and legal context in which it appears in the federal habeas petition. *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 191 (2d Cir.1982), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In order to be subject to federal collateral review, a habeas claim must be the "same claim" as that raised in the state courts. *Velasquez v. Senkowski,* 1991 WL 159054 (E.D.N.Y.1991). To establish that

a federal claim was raised in state court, a petitioner must, in the state courts, (1) have relied on federal case law employing federal constitutional analysis; (2) relied on factually similar state cases employing federal constitutional analysis; (3) asserted the claim "in terms so particular as to call to mind a specific right protected by the Constitution"; or (4) alleged a set of facts well within ordinary constitutional litigation. *Daye, supra,* at 194.

■ In this case, the record indicates that all the grounds on which Stone seeks habeas relief were, to some extent, presented to the state court on direct review. Specifically, in his brief to the Appellate Division on his direct appeal, Stone's second claim challenged several jury selection rulings including challenges for cause made by Stone as to prospective jurors Kelly Berst and Robert Harrington, Petitioner's Appellate Brief at 16–21, as well as the an *in camera* proceeding at which neither Stone nor his counsel were present. *Id.* at 22–31. However, in his application for leave to appeal to the Court of Appeals, Stone refers only to the for cause challenge as to Harrington and the *in camera* proceeding. Petitioner's Application for Leave to Appeal to the Court of Appeals, at 1. Accordingly, Stone's first ground for habeas relief is not exhausted for purposes of federal habeas jurisdiction insofar as it challenges the denial of his for cause challenge as to Berst.

■ Moreover, Stone is precluded from seeking further direct review by the Court of Appeals on this claim and his failure to exhaust it on direct review also forecloses him from seeking collateral relief from the New York courts. *Strogov v. Attorney General of the State of New York,* 191 F.3d 188, 193 (2d Cir.1999) (citing N.Y.Rules of Court, Court of Appeals, § 500.10(a) (McKinney 1999), and N.Y.Crim.Proc.Law § 440.10(2)(c) (McKinney 1994)). Accordingly, Stone has procedurally defaulted on this claim. *Jordan, supra,* at 198–99; *Washington v. James,* 996 F.2d 1442, 1447

(2d Cir.1993), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994). Absent a showing of cause and prejudice for a default, Stone is barred from raising this claim on federal habeas review. *Murray v. Carrier,* 477 U.S. 478, 490–91, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Carter v. United States,* 150 F.3d 202, 205 (2d Cir. 1998).

■ For purposes of testing the availability of federal habeas jurisdiction, "[c]ause" is established by showing "some objective factor external to the defense [which] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639. Included among such factors are constitutionally ineffective assistance of counsel, interference by government officials rendering compliance with the state procedural rule impracticable, or situations in which the factual and legal basis for the claim was not reasonably available to counsel at the time of default. *Murray, supra,* at 488, 106 S.Ct. 2639. " 'Prejudice' is established by showing that the claimed error worked to [the petitioner's] actual and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). A fundamental miscarriage of justice is established by showing that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent" of the crime for which he has been convicted. *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. 2639.

Stone asserts no reasons for failing to present the defaulted portion of his first ground in state court. As such, Stone has failed to demonstrate good cause for the procedural default and this court, therefore, lacks jurisdiction to consider it.

The "mixed" nature of Stone's petition, presenting both exhausted and unexhausted claims, does not, however, require dismissal on that ground. 28 U.S.C. § 2254(b)(2). Accordingly, in the interest of judicial economy the court will review Stone's remaining claims which have not been procedurally defaulted.

■ In reviewing habeas petitions, federal courts do not function as appellate courts to review matters within the jurisdiction of the state, or to review rulings and decisions of state trial and appellate courts; rather, the court determines whether the proceedings in the state court amount to a violation of federal constitutional rights. *Coleman, supra.* Federal review of a state court conviction is limited to errors of federal constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is not entitled to an evidentiary hearing by the federal court, but the granting of a hearing is within the discretion of the federal district court. *Pagan v. Keane,* 984 F.2d 61, 63 (2d Cir.1993); *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 4–5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). The state court's determination, however, is presumed to be correct unless one of the specified conditions pursuant to 28 U.S.C. § 2254(e), is found to exist or unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Absent these factors, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. *Sumner, supra.*

The court is in possession of the state record relevant to Stone's claims, including the trial transcript and challenged statements. Stone has not requested that the court conduct an evidentiary hearing prior to resolving his claims for relief and has not challenged the record below as factually inadequate. Accordingly, an evidentiary hearing is unnecessary.

The AEDPA "also effected some changes upon the nature and extent of review that a federal court can conduct in considering a § 2254 petition." *Berger v. Stinson,* 97 F.Supp.2d 359, 364 (W.D.N.Y. 2000) (Larimer, C.J.). Specifically, 28 U.S.C. § 2254(d) now provides that

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonably determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

■ Justice O'Connor in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1505, 146 L.Ed.2d 389 (2000) (concurring opinion in which four other Justices joined, thus constituting a majority of the court on this issue), explained that § 2254(d)(1) "modifies the role of federal habeas courts in reviewing petitions filed by state prisoners," by giving "independent meaning to both the 'contrary to' and 'unreasonable application' clauses of [§ 2254(d)(1) ]." *Williams, supra,* 120 S.Ct. at 1518, 1519. A state court decision would be "contrary to" the Supreme Court's clearly established precedent if the state court either arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or, confronted by facts "materially indistinguishable from a relevant Supreme Court precedent," arrives at a result opposite to that of the Supreme Court. *Id.* at 1519. Nevertheless, "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 1520.

Justice O'Connor further explained that a state court decision would involve an "unreasonable application" of clearly established federal law as determined by the Supreme Court if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams, supra,* at 1520. "Simply stated, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. *See also Clark v. Stinson,* 214 F.3d 315 (2d Cir.2000) (interpreting *Williams, supra,* as adopting an " 'objectively unreasonable standard as the decisional guide' " as to whether federal law has been unreasonably applied, rather than an "incorrect" or "erroneous" standard).

■ In other words, § 2254(d)(1) presents two avenues by which a habeas petitioner may obtain relief. Habeas relief may be granted under the "contrary to" prong if the state court either failed to invoke the correct legal principle at issue or construed the relevant federal law contrary to the Supreme Court's construction of the relevant constitutional rule established by the Court in a case that is on point with the issue presented in the habeas petition. If no such Supreme Court caselaw exists, the habeas court must then consider whether the state court's decision is an objectively unreasonable application of the relevant federal rule, as established by the Supreme Court, to the issues and facts presented by the case under review.

As discussed *infra,* the record does not demonstrate that in the relevant state court decisions, the correct principles of federal law, determined by the Supreme Court as required under § 2254(d)(1), were not improperly identified or incorrectly applied. Rather, such decisions can be characterized as "run-of-the-mill" deci-

sions "from which [Stone] is not entitled to relief under § 2254." *Berger, supra,* 97 F.Supp.2d at 368 (citing *Williams, supra,* 120 S.Ct. at 1520). Nor has Stone demonstrated that the decision of the Appellate Division, affirming this conviction, was "objectively unreasonable," *Williams, supra,* at 1520, in applying such principles to the facts of this case.

### 1. Challenges to Jury Selection

As stated, Stone challenges the jury selection procedures on two grounds including that Judge Rogowski erroneously denied Stone's for cause challenge with regard to prospective juror Robert Harrington and that the *in camera* conference held with prospective juror Stephen Barrett, at which neither Stone nor his attorney was present, violated his constitutional right to due process. Petition at 7. In opposition, Respondent asserts that Stone has failed to provide anything rebutting the state court's decision, as required under 28 U.S.C. § 2254(d). Respondent's Memorandum at 5.

### A. Denial of Challenge for Cause

Stone asserts that he was denied due process when his challenge for cause as to prospective juror Robert Harrington was erroneously denied. Specifically, Stone maintains that Harrington's inability to unequivocally state, in response to counsel's questioning, that he could follow the court's instructions and not draw an adverse inference from the fact that Stone did not take the stand demonstrated sufficient cause to exclude the juror such that the denial of Stone's challenge for cause denied him of due process.

The following exchange occurred during the jury voir dire:

Ms. Kosmerl: Would you expect a defense or my job or Earl Stone's job to be to convince you that he was not guilty?

Mr. Harrison: Well, I would say it would be a contributing factor.

Ms. Kosmerl: Does that mean that, well, as Judge Rogowski told you at this point we don't know whether he's going to testify or not, that's rarely a decision made at this juncture. Would you feel that someone should take the stand and testify at a criminal trial?

Mr. Harrison: I really don't know that much about the law. I can only say, you know, if a person were truly innocent they might want to say something on their own behalf. That's just a personal feeling.

Ms. Kosmerl: As the Judge will instruct, if the law demands that you not consider that, you would be able to do that?

Mr. Harrison: I believe so.

(VT.498–99).

Stone challenged Harrison for cause arguing that Harrison's statement indicated he was not sure of his ability to remain objective. (VT.521–22). Judge Rogowski denied the challenge and Mr. Harrison was seated on the jury that convicted Stone.

The Sixth Amendment guarantees a defendant the right to a trial by an impartial jury. *Duncan v. Louisiana,* 391 U.S. 145, 159, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). It is within the trial court's discretion whether to grant or deny a challenge for cause and a denial of such a challenge will not support a petition for habeas corpus relief unless the asserted disqualifying fact was so prejudicial that the refusal deprived the defendant of a fundamentally fair trial. *Duran v. Keane,* 1997 WL 204312, *2 (N.D.N.Y.1997) (citing *Sudds v. Maggio,* 696 F.2d 415, 416 (5th Cir.1983)). In considering a petition for habeas relief under § 2254(d), the state trial court's conclusion that the jury was impartial is entitled to a presumption of correctness. *Knapp v. Leonardo,* 46 F.3d 170, 175–76 (2d Cir.1995), *cert. denied,* 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995) (citing *Wheel v. Robinson,* 34 F.3d 60, 65 (2d Cir.1994) (trial court's findings on jury bias entitled to § 2254(e)(1) (for-

merly § 2254(d)) presumption of correct-ness)). According to the Supreme Court, "the trial court's findings of impartiality [may] be overturned only for 'manifest error.'" *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (quoting *Irvin v. Dowd,* 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

 In particular, it is the petitioner's burden to show the "'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Irvin, supra,* at 723, 81 S.Ct. 1639 (quoting *Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244, (1878)); *see also Murphy,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (defendant must show actual existence of prejudice to overcome juror's assurances of impartiality). Further, the mere existence of any preconceived notion as to a defendant's guilt or innocence is, without more, insufficient to rebut the presumption of impartiality provided the juror demonstrates he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin, supra,* at 723, 81 S.Ct. 1639.

In this case, the record does not support a finding that Harrison's presence on the jury resulted in a jury that was other than fair and impartial. Specifically, Harrison stated in response to Ms. Kosmerl's question that he personally felt that "if a person were truly innocent [he] *might* want to say something on [his] own behalf." (VT. 499) (emphasis added). Harrison's use of the equivocal word "might" indicates that Stone's failure to testify on his own behalf would not necessarily cause Harrison to find Stone guilty. Further, in response to Ms. Kosmerl's next question regarding whether Harrison could abide by Judge Rogowski's instruction that under the law, the defendant's failure to take the stand was not to be considered, Harrison responded, "I believe so." *Id.* According to the *voir dire* record, the matter was not pursued further by Stone's counsel. The record thus demonstrates that even if Har-

rison had any preconceived notion that Stone was required to prove his innocence or that Stone's failure to take the stand could be interpreted as an indication of his guilt, Harrison's response that he believed himself capable of setting aside such an idea in accordance with Judge Rogowski's instructions on the law establishes that Stone's Sixth Amendment right to a fair and impartial jury was not violated by Harrison's presence on the jury. In contrast, Stone has not presented anything establishing "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Irvin, supra,* at 723, 81 S.Ct. 1639. As such, Stone has failed meet his burden of proof as to this argument.

Accordingly, Stone's petition for habeas relief is, on this ground, DISMISSED.

**B. *Presence During In Camera Conference with Prospective Juror***

Stone challenges his absence from an *in camera* conference at which a prospective juror informed Judge Rogowski of a threatening telephone call received the previous evening from someone who was incarcerated in the Erie County Holding Center. Petition at 8. Stone maintains that the *in camera* proceeding thus violated his right to counsel and to confrontation. *Id.*

 A defendant has the right to be present at his criminal prosecution under both the Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause. *Kentucky v. Stincer,* 482 U.S. 730, 736, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). "The right to be present at all stages of one's trial constitutes a foundation principle underpinning the entire law of criminal procedures." *United States v. Fontanez,* 878 F.2d 33, 35 (2d Cir.1989). That right may be either expressly or impliedly waived, so long as the waiver is made knowingly and voluntarily. *Cuoco v. United States,* 208

F.3d 27, 30 (2d Cir.2000); *United States v. Rosario*, 111 F.3d 293, 299 (2d Cir.1997).

 The primary interest secured by the Sixth Amendment is the right to cross-examine witnesses to ensure the integrity of the fact-finding process. *Stincer, supra,* at 736, 107 S.Ct. 2658 (citing cases). However, fact-finding was not at issue during the *in camera* proceeding at which neither Stone nor his attorney were present and that discussion had no bearing on Stone's right to cross-examine any witnesses. As such, Stone's absence from that conference did not violate the Sixth Amendment Confrontation Clause.

 Nevertheless, a defendant has a due process right " 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge,' " even in situations where the defendant is not confronting evidence or witnesses against him. *Stincer, supra,* at 745, 107 S.Ct. 2658 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

 Due process requires permitting a defendant's presence " 'to the extent that a fair and just hearing would be thwarted by his absence,' " although the privilege of such presence in not constitutionally guaranteed " 'when presence would be useless, or the benefit but a shadow.' " *Stincer, supra,* at 745, 107 S.Ct. 2658 (quoting *Snyder, supra,* at 106–108, 54 S.Ct. 330). "The 'touchstone of due process analysis . . . is the fairness of the trial.' " *United States v.. Rosario, supra,* at 298 (quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Stincer, supra.* (holding no due process violation based on defendant's absence from competency hearing of two child witnesses where all questions asked pertained to children's ability to distinguish between truth and falsehood and to determine the children's understanding of moral obligation to be truthful as no questions pertained to expected substantive testimony). "Under this standard, the defendant's absence is reversible error only where it would have a 'relation, reasonably substantial, to his opportunity to defend.' " *Clark, supra,* at 323.

 In this case, it cannot be seriously maintained that Stone's due process rights were thwarted by his absence from the *in camera* conference in which a prospective juror informed the trial judge of receiving threatening telephone calls advising the juror to make sure he got on the jury and that Stone was acquitted. In particular, the presence of Stone and his attorney at the *in camera* conference "was not required to ensure fundamental fairness or a 'reasonably substantial . . . opportunity to defend against the charge.' " *United States v. Gagnon,* 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting *Snyder, supra,* at 115, 54 S.Ct. 330). In fact, the charges pending against Stone were not the subject of the conference. Nor is there any indication that the defense would have gained anything had either Stone or his attorney been permitted to attend the conference. Stone asserts that had he been present or represented by his attorney at the conference, he would have been able to challenge Bennett's claim regarding the threatening telephone calls. Petitioner's Reply at 11, n 2. Nevertheless, assuming *arguendo* that Bennett's claim regarding the telephone call was not truthful, such falsehood had no impact of the trial's fundamental fairness as the reason for Bennett's excusal was never revealed to the remaining jurors.

 Moreover, even if Stone's absence from the *in camera* conference could implicate his due process rights, the record also demonstrates that Stone waived his right to be present at such conference. Following the *in camera* conference, Judge Rogowski advised Stone and coun-

sel for both sides of the discussion with Mr. Bennett and that, based on such conference, Bennett should be excused for cause. (VT.481–82). Significantly, at that time Stone raised no objection the excusal but, rather, Stone's attorney explicitly consented to it. (VT.482). By failing to object to the decision to excuse Bennett, based on *the in camera* discussion, Stone impliedly waived his right to be present as such conference. *See Clark, supra,* at 305–06 (colloquy put on record in defendant's presence, unaccompanied by any contemporaneous objection or other evidence indicating involuntary or unknowing waiver, sufficiently established under federal law defendant's valid waiver of right to be present during portion of identification hearing); *Gagnon, supra,* at 527–29, 105 S.Ct. 1482 (defendant waives right to presence at *in camera* meeting between judge and juror where defendant knows about meeting and its purpose but did not assert right to attend); *United States v. Gallego,* 191 F.3d 156, 171 (2d Cir.1999) (defendant waived right to be present at *in camera* meeting between judge, counsel, and prospective jurors because judge announced meeting and its purpose in open court and defendant did not object to meeting, either before or after, nor request to participate); *Cardinal v. Gorczyk,* 81 F.3d 18, 19–20 (2d Cir.1996) (defendant waived right to presence at sidebar to conduct *voir dire* by remaining seated at counsel table during sidebar). Thus, even if Stone had a right to be present at the time the juror's potential excusal was considered, the court finds, on this record, it was waived. Accordingly, Stone's petition should, on this ground, be DISMISSED.

## 2. *Prosecutorial Misconduct*

Stone also challenges several statements made during the prosecution's summation on the basis that such statements shifted the burden of proof to the defense, vouched for the credibility of the people's witnesses, distorted and misrepresented factual and evidentiary matters and denigrated Stone and his attorney. Petition at 6, 8; Petitioner's Reply at 11–12 (incorporating by reference Stone's Brief on Appeal, pp. 32–36). In particular, Stone claims that during summation, Schwegler improperly shifted the burden of proof to Stone, argued matters outside the record and vouched for the credibility of the prosecution's witnesses. Petitioner's Reply at 11. Respondent maintains that Stone is not entitled to any relief on this claim because he has failed to provide anything that rebuts the presumption of correctness accorded the state trial court's decision as required to obtain habeas relief under 28 U.S.C. § 2254(d).

The test for an alleged denial of due process based upon prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). To deny a petitioner due process based on a prosecutorial statement, the statement has to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990). "In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." *United States v. LaMorte,* 950 F.2d 80, 83 (2d Cir.1991) (citing *United States v. Biasucci,* 786 F.2d 504, 514 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986)). In determining the degree of prejudice to a petitioner, the factors to consider are the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *La Morte, supra,* at 83; *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981).

In reviewing a prosecutor's alleged inflammatory statements, it is necessary to distinguish between prosecutorial misstatements as ordinary trial error and a prosecutor's comments constituting egregious conduct. *Floyd v. Meachum, supra,* at 353; *Sales v. Harris,* 675 F.2d 532, 541 (2d Cir.1982), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982). In addition, such challenged statements must be evaluated against the backdrop of the whole trial, including the amount of evidence against the defendant and the court's instructions to the jury, and requires, for a grant of a writ on this basis, that the references be excessive or inflammatory. *See Floyd v. Meachum, supra,* at 354–55; *United States v. Bivona,* 487 F.2d 443 (2d Cir.1973). No matter how improper the prosecutor's comments were, the only concern of the court in reviewing a claim of prosecutorial misconduct on a federal habeas petition is the fundamental fairness of the trial. *Donnelly, supra,* at 645.

Statements made by prosecutors in their summation, even if seemingly improper, do not necessarily exceed "the broad range of rhetorical comments allowed in closing arguments." *Harper v. Kelly,* 704 F.Supp. 375, 379 (S.D.N.Y.1989), *rev'd on other grounds,* 916 F.2d 54 (1990). *See also Donnelly, supra,* at 646–47 (isolated passages of a prosecutor's argument, even if imperfect, do not suggest that a jury will be so profoundly affected so as to affect the fundamental fairness of a trial).

In this case, one basis of Stone's prosecutorial misconduct claim is that the prosecutor's summation improperly shifted the burden of proof to the defense, specifically, Schwegler's statement that the prosecution and defense both have subpoena power over all witnesses. (T. 732). Although it is plausible to interpret Schwegler's comment as referring to Stone's failure to present more witnesses on his behalf, a fair reading of that statement taken in its entire context indicates that Schwegler was merely responding to Kos-

merl's statement on summation regarding the prosecution's power. (T. 732). Specifically, Schwegler's statement was "I was jotting notes quickly as Miss Kosmerl was speaking, this constant harangue about the power of the People and we can threaten, we can do this, we can do that. The defense has the same, quote, subpoena power, they can bring in anybody they please, if they please." (T. 732). Significantly, Schwegler did not tie Stone's failure to present more witnesses on his behalf to the fact that Stone could have subpoenaed other witnesses, yet failed to do so. As Schwegler subsequently explained, his comment was made in response to Kosmerl's statement and was intended to clarify that the use of subpoena power to secure a witness's presence at trial was not limited to the prosecution, thereby granting the prosecution an advantage, but was also available to the defense. (T. 733). Schwegler also acknowledged that the defense did not have the burden of proof. (T. 733). Further, the record indicates that Judge Rogowski instructed the jury that "the burden of proving a Defendant's guilt rests with the People throughout the entire trial. It extends to every element of every crime charged in the indictment and it never under any circumstances shifts to the Defendant." (T. 782). There was no objection to that charge. Thus, any attenuated inference from the prosecutor's statement suggesting the defense had any burden to establish innocence was overcome by the court's unequivocal instruction establishing the contrary.

Moreover, the overwhelming evidence presented against Stone renders Schwegler's statement unlikely to have so profoundly affected the jury as to render the trial fundamentally unfair. Specifically, testifying on behalf of the prosecution were three of the four surviving targets of the shooting incident, Jerry Knightner, Marion Clay and Clarence Jackson. Calvin Bryant, who witnessed the third incident identified Stone as the shooter and

Bryant's girlfriend, Teresa Dillon, placed Stone inside Bryant's house with a "big gun" immediately following that shooting. Shamika Walton's, Stone's girlfriend in Virginia, testimony as to what Stone told her about his involvement in three shooting incidents in Buffalo, largely corroborated the facts as presented at trial. Furthermore, Stone's flight from Buffalo to Virginia following the shootings could properly be considered by the jury as indicative of guilt. *See United States v. Amuso*, 21 F.3d 1251, 1259 (2d Cir.) (holding jury could rationally infer that flight was indicative of guilty conscience), *cert. denied*, 513 U.S. 932, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994).

▪ Stone also claims prosecutorial misconduct on the basis that Schwegler vouched for the credibility of the people's witnesses, referring to the statement that

It was the truth the moment [Jerry Knightner] was shot and stumbled into [Precinct] Number 12, it was the truth on April 21st when he told the Grand Jury what had happened, and it was the truth several days ago when he told it to you here from the witness stand under oath.

(T. 744).

▪ Stone similarly challenges Schwegler's statement that

Buffalo police actually on each occasion did actually a very good job. I think as you deliberate you'll see it. After the first shooting, within twenty minutes, they have a suspect in custody. A second shooting of Marlon Clay, within a couple of hours ... [T]he whole bunch of them actually did a pretty decent job in each of these shootings.

(T. 753–54).

▪ It is improper for a prosecutor to either express his own personal belief or opinion as to the truth of falsity of any testimony or evidence regarding the guilt of the defendant, or to vouch for the credibility of witnesses. *Floyd, supra,* at 354. The record indicates, however, that Stone never objected to either of these two statements and, based on such a failure to preserve the issue for federal review, it is procedurally defaulted. Accordingly, federal review of the claim is barred unless the petitioner can demonstrate cause for the procedural default and prejudice flowing therefrom, or that failure to consider the claim and grant relief will result in a "fundamental miscarriage of justice." *Vargas v. Keane,* 86 F.3d 1273, 1280 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996) (citing *Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and quoting *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).

The record indicates that the first statement in which Schwegler commented that Knightner truthfully had testified was merely a rhetorical comment, invited by Kosmerl's statement that the prosecution's "evidence came from the parade of perjurers that you've heard from during the course of the trial." (T. 716). Further, the second statement that the Buffalo police officers did a "very good job" investigating the shootings with which Stone was accused does not implicate the truthfulness of any testimony. On this record, the court does not find that the failure to grant relief based on the challenged statements will result in a "fundamental miscarriage of justice." *Vargas, supra.* Accordingly the petition is, on this ground, DISMISSED.

▪ Stone's claim that Schwegler distorted and misrepresented factual and evidentiary matters refers to the fact that the prosecution was permitted to introduce Maron Clay's grand jury testimony only for impeachment purposes. Specifically, when asked at Stone's trial who had shot him, Clay testified that he was unable to see well enough to identify the shooter. (T. 542). Clay was then declared a hostile witness and impeached with his grand jury testimony. (T. 549–50, 552–57). During

summation, Schwegler stated that during Clay's testimony, Clay "finally came around, yes, all right, yes, he's the one that shot me." (T. 738). According to Stone, Schwegler thus misrepresented Clay's testimony, thereby confusing the jury as to what was evidence in chief and what was impeachment evidence.

Stone has, however, also procedurally defaulted on this claim as he did not object to the statement when made and, thus, has failed to preserve it for further review and the court's failure to consider this claim will not result in a fundamental miscarriage of justice. Specifically, although Schwegler's statement was arguably improper, the court thoroughly instructed the jury that it was to consider Clay's Grand Jury testimony only for the purpose for which it had been admitted into evidence, *i.e.*, to impeach Clay's trial testimony that he was unable to identify who shot him. (T. 817–818). Such instruction provided:

> Part of Marlon Clay's testimony involved a material issue of the case concerning the identity of the person who shot him. During his direct testimony Marlon Clay testified that at the time of the shooting he was unable to identify the person who shot him. The People were then allowed to show that Marlon Clay had previously made a prior sworn statement contradictory to such testimony. I instructed you during the trial and I instruct you again that such testimony, called impeachment testimony, is received into evidence only for the purpose of impeaching the credibility of Marlon Clay with respect to his testimony upon the identity of the shooter at the time of the shooting and does not constitute evidence in chief in support of the People's case.

(T. 817–818).

The jury instruction thus negates any finding that Schwegler's mischaracterization of Clay's testimony, even if improper, rendered Stone's trial so fundamentally unfair so as to deprive Stone of his due process rights. *Darden, supra,* at 183, 106 S.Ct.

2464. While deliberating, the jury requested further instruction as to which portion of Clay's testimony could be considered. (T. 870). Judge Rogowski then instructed that

> all of the testimony of Marlon Clay may be used by you as you would any other testimony of any other witness, with the exception of the testimony relating to the identity of the person shooting at him at the time of the shooting. And, therefore, any statements that were introduced regarding his prior testimony as to who did the shooting, cannot be used by you as direct evidence in the case but can only be used to impeach the credibility of the witness.

(T. 870).

The court finds this instruction sufficient to clarify any questions which may have resulted from Schwegler's comment as it expressly directs the jury not to consider Clay's testimony with regard to the identity of the shooter. Further, as discussed, the record demonstrates that the other direct evidence against Stone was overwhelming. *See* Discussion, *supra,* at 23–24. Accordingly, this statement provides no basis to grant Stone's petition for habeas relief based on prosecutorial misconduct.

■ Finally, Stone's claim that the prosecution repeatedly denigrated Stone and his attorney refers to several comments by Schwegler during summation including: (1) "Jerry Knightner. Again [referring to Kosmerl's remarks] the DA is pressuring him, the DA pressured, DA pressured, I'm so sick of hearing that, pressure." (T. 735); (2) "Miss Kosmerl is going to—in her statement says, oh, this big scam, this big show they're putting on, all these witnesses are scared. We don't do that, she knows better." (T. 736–37); (3) "As a final thing, [Kosmerl] forgot to remind you how she called ADA Schaffer to the stand here this morning. That was certainly enlightening, wasn't it?" (T. 742); (4) "Then he gets a phone call from

our pal over here, the Defendant." (T. 744); and (5) "He [referring to Stone] must be nuts ..." (T. 755).

A careful reading of the record indicates that Stone objected to only the second of these five statements. (T. 736–37). As such, the federal review of the unobjected to claims is barred unless Stone demonstrates cause for the procedural default and prejudice flowing therefrom, or that a fundamental miscarriage of justice will result from failure to consider the claim as a basis for relief. *Vargas, supra,* at 1280. However, Stone has neither demonstrated any cause for failing to object and prejudice flowing therefrom, nor that a fundamental miscarriage of justice will result if the court fails to consider the alleged impropriety of such statements and the record does not indicate otherwise. Rather, the record shows that the first, fourth and fifth statements including the response to Kosmerl's remark concerning pressure by the District Attorney, the reference to Stone as "our pal the defendant," and as "nuts", even if considered as excessive and unwarranted sarcasm, were not so excessive or inflammatory as to arise to the level of egregiousness necessary to warrant habeas relief. *See Darden, supra,* at 180, 106 S.Ct. 2464. *See also Tankleff v. Senkowski,* 135 F.3d 235, 253 (2d Cir.1998) (brief and fleeting nature of prosecutor's misconduct at trial mitigated severity of improper comments). Further, the fourth statement regarding the testimony of Assistant District Attorney Schaffer who was present at the proceedings of the grand jury that indicted Stone merely was mere rhetoric intended to remind the jury that Stone's sole witness presented testimony that was other than exculpatory. (T. 672–90). Federal habeas review of the four statements to which no objection was raised is, therefore, barred.

 Additionally Stone's objection to Schwegler's comment regarding Kosmerl's characterization of the prosecution's case as a "scam" was sustained by Judge Rogowski who immediately instructed the jury to disregard it. (T. 736–37). *See United States v. Biasucci,* 786 F.2d 504, 514 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986) (holding no ground for new trial based on denial of due process where judge struck prosecution's inappropriate comment from record and immediately gave curative instruction). Moreover, federal habeas relief is not appropriately granted based only on improper comments made during summation in an otherwise fair trial. *Biasucci, supra,* at 514. Accordingly, Stone's petition is, on this ground, DISMISSED.

The court finds that none of the challenged remarks, either singly or in combination, rendered Stone's trial so fundamentally unfair so as to deprive Stone of his due process rights. *Darden, supra,* at 183, 106 S.Ct. 2464. The alleged prosecutorial misconduct was not so prejudicial so as to deprive Stone of his right to a fair trial. The record indicates that the evidence against Stone was overwhelming. Stone's petition is DISMISSED as to this ground.

### 3. *Sufficiency of the Evidence*

Stone's final ground for relief is that the trial evidence was insufficient to sustain the conviction of second degree murder as to the shooting death of Rayshawn Washington and that his conviction is therefore against the weight of the evidence. Specifically, Stone maintains that the evidence at trial did not establish that he intentionally killed Washington.

 "A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.), *cert. denied,* 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). The standard to be applied in a federal habeas corpus petition when the claim is made that the petitioner has been convicted in state court on insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In considering the sufficiency of the evidence on a habeas petition attacking a conviction, the court is required to look to the relevant state law to determine the elements of the crime. *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999). Where facts presented at trial support conflicting inferences, a federal habeas court must presume that conflicts were resolved in favor of the prosecution. *Jackson, supra*, at 326, 99 S.Ct. 2781. The court is not required to decide whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but whether any rational trier of fact could have found guilt beyond a reasonable doubt based on the evidence presented. *See Jackson, supra*, at 319, 99 S.Ct. 2781. In making this assessment, a federal habeas court must "credit every inference that could have been drawn in the state's favor ... whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.1988), *cert. denied*, 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988). The jury is also permitted to "draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra*, at 319, 99 S.Ct. 2781. The instant record demonstrates sufficient evidence supports Stone's conviction of intentional murder in the second degree.

 Pursuant to New York law, a person is guilty of intentional murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25[2]. Under this definition, it is not necessary to establish that the resulting death is of the defendant's intended victim; rather, what is required is that the requisite intent to kill is established and the death of a person results. *People v. Fernandez*, 88 N.Y.2d 777, 650 N.Y.S.2d 625, 673 N.E.2d 910, 913 (1996), *habeas corpus denied sub nom. Fernandez v. Dufrain*, 11 F.Supp.2d. 407 (S.D.N.Y.1998). Thus, "[t]he doctrine of 'transferred intent' serves to ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some other 'lucky mistake,' the intended target was not the actual victim ." *Id.* Intent is established by proving what was in the defendant's mind at the time of the crime. *Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir.1984). Intent need not be proven by the defendant's express statement but may be inferred, *Fratarcangelo v.. Smith*, 792 F.2d 40, 43 (2d Cir.1986), and "circumstantial evidence is as persuasive as direct evidence" with regard to establishing an intent to kill. *Mallette, supra.* Such circumstantial evidence may, under New York law, include a defendant's actions subsequent to the crime, such as falsehoods and flight. *Mallette, supra*, at 32 (citing cases).

 Accordingly, in the instant case, by finding Stone guilty of intentionally murdering Rayshawn Washington, the jury found, either by direct or circumstantial evidence, that Stone had formed the requisite intent to kill someone when he fired the shots that struck Washington, regardless of whether Washington was Stone's subjective intended target. The court, therefore, considers whether the record as a whole contains sufficient evidence to support such a finding. The record demonstrates that Jerry Knightner and Kelvin Bryant both identified Stone as the individual who fired gunshots into the Tremaine Jacob's Ford Bronco in which Washington was a passenger when he sustained his fatal injuries. Knightner described Stone's gun as an AK–47 or an AR–15, commonly known as semi-automatic assault weapons. Shamika Walton also placed Stone at the scene of the shooting. Although Clarence Jackson was unable to identify the shooter, his description of the events surrounding the shooting, including where he was, the other occupants of the

vehicle and that numerous shots were fired are consistent with Knightner's testimony. Although no weapon was ever recovered, both Kelvin Bryant and Teresa Dillon testified that immediately following the shooting, they saw Stone with a gun described by Bryant as "a loaded black and brown stock AK with a banana clip" and by Dillon as "big." (T. 398, 450). Following the third shooting incident, Stone fled the area.

The above described testimony was sufficient for the jury to determine that Stone was the individual who fired the shot that killed Washington. Thus, the court considers whether such evidence was also sufficient to establish the *mens rea* requirement of intent sufficient for the jury to find Stone guilty of intentional murder in the second degree beyond a reasonable doubt in violation of N.Y. Penal Law § 125.25[1]. It is reasonable to conclude that firing multiple gunshots from a dangerous assault weapon, designed to kill and maim humans, into a vehicle in which passengers are seated is likely to result in the death of at least one of the passengers. That the third shooting incident was the second time that Stone had fired gunshots into a vehicle and injured an occupant indicates that Stone was well aware of the potentially lethal nature of such shootings. The record thus readily supports the jury's finding that Stone intended to kill someone when he fired at the vehicle.

As such, Stone's petition is, on this ground, DISMISSED.

### CONCLUSION

Based on the foregoing, the Petition is DISMISSED. Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability shall not issue. 28 U.S.C. § 2253 (1996).

SO ORDERED.